IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

|                                      |   |                                          |
|--------------------------------------|---|------------------------------------------|
| Angela Gaye Shivers,                 | ) |                                          |
|                                      | ) | Civil Action No. 6:12-3381-SB-KFM        |
| Plaintiff,                           | ) |                                          |
|                                      | ) | **REPORT OF MAGISTRATE JUDGE**           |
| vs.                                  | ) |                                          |
|                                      | ) |                                          |
| Carolyn W. Colvin, Acting            | ) |                                          |
| Commissioner of Social Security,[1]  | ) |                                          |
|                                      | ) |                                          |
| Defendant.                           | ) |                                          |
|                                      | ) |                                          |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on December 3, 2009, alleging that she became unable to work on November 1, 2005. The applications were denied initially and on reconsideration by the Social Security Administration. On March 18, 2011, the plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing.  The plaintiff amended her alleged onset date to April 20, 2009.  The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmitt, an impartial vocational expert, appeared on September 16, 2011, considered the case *de novo*, and on October 13, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on September 25, 2012.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

(2)    The claimant has not engaged in substantial gainful activity since April 20, 2009, the amended alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: back disorder, chronic obstructive pulmonary disease (COPD), obstructive sleep apnea, hypertension, bipolar disorder, and anxiety (20 C.F.R. §§  404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). Specifically, the claimant is able to lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for 6

2

hours in an 8-hour day, and stand and walk occasionally. She may perform postural movements occasionally. The claimant must avoid concentrated exposure to respiratory irritants. She is limited to simple, routine, repetitive tasks requiring no more than occasional contact with coworkers and no contact with the general public.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on June 2, 1964, and was 41[3] years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

---

[3]This appears to be a scrivenor's error as the plaintiff was 44 years old on the amended alleged disability onset date. This error does not appear to have had any bearing on the case as the ALJ considered the appropriate age category and properly noted that the plaintiff subsequently changed age categories (Tr. 56).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from April 20, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually

4

performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the

5

conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### *Physical Treatment Records*

The plaintiff visited Dr. Michael Spandorfer, a pulmonologist, periodically from April 2008 through April 2010. She complained of respiratory and sleep problems; testing normally revealed moderate airflow obstruction; and Dr. Spandorfer prescribed medication, recommended the use of a CPAP machine for sleep apnea, and advised the plaintiff to lose weight and exercise (Tr. 405-407, 409-11, 412-15, 416-19, 420-23).

On April 1, 2008, the plaintiff presented at the Bon Secours St. Francis emergency room in Charleston with a one day history of cough, shortness of breath, and wheezing. The plaintiff was admitted and placed her on inhaled bronchodilators, inhaled corticosteroids, IV antibiotics, and IV steroids. Discoloration in the fingers that was worse with cold and associated with tightness of her skin was noted. The plaintiff remained hospitalized until April 4, 2008. Discharge diagnoses included acute hypoxic respiratory insufficiency, community acquired pneumonia, chronic obstructive pulmonary disease ("COPD") exacerbation, tobacco abuse, anxiety, and hypertension (Tr. 359-60). Chest x-ray revealed slight haziness at the right lung base suspicious for pneumonia (Tr. 375).

Dr. Spandorfer examined the plaintiff on April 28, 2008, for evaluation of her COPD, asthma, obstructive sleep apnea ("OSA"), persistent cough, granulomatous lung disease, and insomnia. Her coughing increased at night and disturbed her sleep. Her blood pressure was 142/93, and respiration was 20. The plaintiff was 5'7" tall and weighed 192 pounds. On exam, Dr. Spandorfer reported hyper-inflation of the plaintiff's chest with bilateral fine expiratory wheezes. Spirometry revealed moderate airflow limitation. Dr. Spandorfer's diagnoses included COPD with chronic bronchitis, persistent cough, asthma,

and insomnia with OSA.  He encouraged the plaintiff to try to quit smoking, proceed with exercise, weight loss, sleep hygiene techniques, and undergo an overnight polysomnogram (Tr. 420-22).

On May 14, 2008, the plaintiff was examined in the emergency room for evaluation of bloody cough diagnosed as upper respiratory infection, and Levaquin was prescribed (Tr. 263-64).  Chest x-ray revealed new minimal infiltrate in the right mid-lung (Tr. 275).

The plaintiff used the Patient One Medical Center for primary care.  In 2008, she visited the center often, complaining of various pains, and received prescriptions for Percocet (Tr. 427-28, 429-31, 432-35, 438, 439-40, 441-43, 444-46, 447-49, 452, 453-54).  On July 28, 2008, Dr. Francis Tunney of Patient One examined the plaintiff for evaluation of back pain.  The examination revealed lumbar tenderness to the right and left of midline.  Dr. Tunney's assessment included hypertension and low back pain for which she prescribed Percocet and Naprosyn and referred the plaintiff to a specialist (Tr. 439-40).

At November 2008 appointments, the plaintiff asked for more Percocet for back pain (Tr. 456, 458, 460-61).  Specifically, at follow-up appointments on November 26, 2008, and December 20, 2008, Dr. Paul Cump of Patient One saw the plaintiff and noted that she continued to experience back pain.  His assessment included hypertension, obesity, and degenerative lumbar spine.  Dr. Cump refilled her Percocet prescription (Tr. 460-61, 467-69).

A CT scan of the plaintiff's chest dated January 1, 2009, revealed a few lung nodules, which were probably not significantly changed along with calcified mediastinal lymph nodes.  No acute intrathoracic disease was evident (Tr. 638).

On January 12, 2009, Dr. Spandorfer saw the plaintiff at a follow-up noting that she continued to experience difficulties with coughing accompanied by shortness of breath and wheezing after going into a burning home.  She had a course of prednisone with

7

some improvement of symptoms.  Spirometry revealed moderate airflow limitation.  Dr. Spandorfer's assessment included COPD with asthma/chronic bronchitis, granulomatous lung disease with history of Mycobacterium Avium Complex infection, midline neck mass, OSA, and insomnia.  He encouraged the plaintiff to stop smoking (Tr. 416-18).

On January 23, 2009, the plaintiff began seeing Dr. Thomas Duc, Jr., a pain specialist (Tr. 815).  The plaintiff saw Dr. Duc approximately every month for a year for injections to treat joint and back pain and for narcotic pain medication prescriptions (Tr. 795-819).  In a March 2010 treatment note, Dr. Duc wrote that he "counseled [the plaintiff] concerning narcotics . . . meds from multiple sources . . . last chance" (Tr. 798).  In April 2010, the plaintiff was given a random drug test as was protocol for a patient on chronic narcotic therapy.  There was no evidence of abuse or diversion (Tr. 817).  In a May 2010 evaluation, Dr. Duc stated that treatment provided the plaintiff good pain relief (Tr. 814).

On February 2, 2009, the plaintiff presented to the emergency room complaining of local pain over her left shoulder accompanied by chest pain.  Diagnoses included nausea, acute bronchitis, and chest pain (Tr. 334-40).  Chest x-ray revealed cardiomegaly (Tr. 348).  On February 9, 2009, Dr. Duc administered another transforaminal epidural injection and denied the plaintiff's request for early refill of Percocet (Tr. 811).  On February 23, 2009, Dr. Duc administered a paravertebral facet joint injection (Tr. 812).  Also in February 2009, treating physician Dr. Tunney told the plaintiff to use less narcotic medication and prescribed Ultram (Tr. 484-86).

On March 16, 2009, the plaintiff had surgery for a mass of tissue on her neck that had been discovered eight months earlier and had been growing (Tr. 624-29).  A fine needle aspiration of the mass indicated that it was benign.  After the surgery, the plaintiff suffered respiratory failure and had to spend an extra day on a ventilator.  Diagnoses included mass to anterior neck, postoperative respiratory failure, hypertension and gastroesophageal reflux disease ("GERD") (Tr. 624-26).

8

On March 23, 2009, Dr. Duc administered another paravertebral facet joint injection (Tr. 810).

On March 31, 2009, Dr. Spandorfer saw the plaintiff during a follow-up from her hospitalization noting that she continued to suffer from cough, wheezing, shortness of breath, and sleep apnea symptoms.  Spirometry revealed a mixed disorder with moderate restriction and airflow limitation (Tr. 408-09).

On July 10, 2009, the plaintiff visited the Trident Regional Medical Center ("Trident") emergency room complaining of fever and swollen extremities (Tr. 300, 683, 659).  Doctors found that the plaintiff had crushed Oxycontin pills, diluted them with water, and injected the mixture into her veins, and under the skin of her hands and feet (Tr. 300). The plaintiff was hospitalized for five days.  The treating physician, Dr. Khoury, noted the plaintiff's history of intravenous drug abuse and diagnosed fever caused by intravenous drug use (Tr. 303).

On July 11, 2009, the plaintiff had an echocardiogram.  The resulting report revealed that her left ventricular systolic function was normal with an ejection fraction greater than 55%; mild concentric left ventricular hypertrophy; and markedly enlarged right atrium and moderately enlarged right ventricle; severe tricuspid regurgitation and moderate pulmonary hypertension (Tr. 298-99).  X-rays of her left hand revealed diffuse soft tissue swelling with no osseous injury detected (Tr. 291).  Head CT was remarkable for what appeared to be a right external capsule lacunar infarct with mildly advanced cortical atrophy (Tr. 293).  A transesophageal echo done on July 13, 2009, revealed continued severe tricuspid regurgitation and marked enlargement of right atrium with continued moderate enlargement of the right ventricle (Tr. 297).

On October 19, 2009, the plaintiff was hospitalized again for three days for uncontrolled hypertension accompanied by three day headache and nausea.  Exam revealed that the plaintiff was anxious and in moderate distress.  Her blood pressure was

9

236/98.  Discharge diagnoses included hypertension secondary to non-compliance from inability to afford medications (Tr. 772-75, 784-85).

On November 3, 2009, the plaintiff presented to the emergency room after falling about three feet down stairs resulting in rib/chest wall and right elbow pain.  Exam revealed tenderness to palpation to lower costal margin with a local contusion over right chest to lower costal margin with mild to moderate joint pain on movement of the right antecubital and elbow.  X-ray of the radial head showed an acute fracture.  Diagnoses included closed fracture of the radial head, blunt type injury to elbow, chest wall contusion, chest injury, and local rib/chest wall pain (Tr. 322-28).  Chest x-ray showed cardiomegaly and prior granulomatous exposure (Tr. 329).  Right elbow x-ray showed a mildly comminuted intraarticular fracture of the right radial head (Tr. 330).

On November 11, 2009, Dr. Spandorfer saw the plaintiff at a follow-up noting that she continued with daily symptoms of breathlessness, cough, wheezing, and chest pain.  Spirometry revealed unchanged severe airflow limitation.  Dr. Spandorfer's assessment included COPD, granulomatous lung disease with pulmonary nodule, OSA and pleurisy, and persistent cough.  He ordered a CT of the plaintiff's chest and advised her to follow up the scan (Tr. 408-09).

Dr. Spandorfer saw the plaintiff for a recheck on January 12, 2010, noting that she continued to suffer from COPD with persistent cough, OSA and anxiety with mild worsening of shortness of breath and persistent cough accompanied by occasional wheezing at night and occasional chest tightness with some lower extremity edema.  She was smoking less than a pack a day and was struggling with the idea of quitting.  Dr. Spandorfer also reported that the plaintiff continued with some anxiety for which she obtained past relief with Ativan and that she continued on Lortab as needed for persistent cough.  Her weight was 167 lbs.  Spirometry revealed moderate airflow limitation with improvement.  He assessed her OSA as stable (Tr. 404-405).

10

On April 20, 2010, Dr. Spandorfer saw the plaintiff for a recheck. He noted that she had a productive cough, wheezing, chest tightness, decreased energy, and shortness of breath with activity, and that she continued to use CPAP at least three times a week. Spirometry revealed moderate airflow limitation. Dr. Spandorfer's assessment included COPD, stable OSA, anxiety, MAC, HTN (Tr. 554-55).

An abdominal CT scan dated April 20, 2010, revealed a large cystic mass in the left adnexal region with definite eccentric wall thickening that was worrisome for ovarian carcinoma (Tr. 603-04). On May 13, 2010, Dr. Tunney saw the plaintiff for a follow-up for abdominal pain. He noted that she complained of general fatigue and weakness over past two weeks that was getting worse. She had been diagnosed with hypokalemia in February that reportedly appeared resolved by May 20, 2010 (Tr. 651-653, 656).

On July 9, 2010, the plaintiff presented to the emergency room complaining of chest pain, difficulty breathing, and nausea. The examiner noted that she appeared unkempt, older than stated age, and had been abusing oxycodone for one week, was anxious but did not appear to be in pain. She had multiple IV drug abuse sites including left wrist with erythema and swelling. EKG revealed left atrial enlargement. The plaintiff was admitted for observation (Tr. 678-82). Discharge diagnoses included atypical chest pain likely secondary to anxiety for opioid withdrawal, opioid dependence, and hypertension (Tr. 713-14). Echocardiogram showed left ventricular systolic function was normal with ejection fraction greater than 55% and mild concentric left ventricular hypertrophy. Right ventricle was moderately enlarged. Right atrium was markedly enlarged. Severe tricuspid regurgitation was present. There was moderate pulmonary hypertension (Tr. 683-84).

On February 1, 2011, the plaintiff sought treatment at the Dream Center Clinic after being out of her blood pressure medication for two months. The Dream Center referred the plaintiff to the emergency room (Tr. 868). She was diagnosed with uncontrolled hypertension (Tr. 852-54). The Dream Center saw the plaintiff again on February 15, 2011,

11

noting that her blood pressure remained elevated at 196/100.  Lisinopril was added (Tr. 867).  On April 5, 2011 the plaintiff presented to the emergency room with headache, elevated blood pressure, productive cough, and shortness of breath.  Impression was acute headache, bacterial pneumonia, and uncontrolled hypertension (Tr. 848-51).

On August 29, 2011, the plaintiff sought follow-up care at the Dream Center Clinic where her blood pressure was noted to be 200/140, 220/150, and 210/130.  The Dream Center referred her back to the emergency room for hypertensive crisis stabilization (Tr. 866).  On August 30, 2011 the Dream Center Clinic noted that the plaintiff was an indigent patient with badly out of control hypertension for which she was taking only Metoprolol 50mg a day.  Her blood pressure was 200/140, 220/150, and 210/130, and she was again referred to the emergency room.  The examiner noted that the plaintiff also suffered from depression and panic attacks for which she had been on sertraline and lorazepam, and that the sertraline was renewed but that the clinic could not prescribe lorazepam.  Finally, it was noted that the plaintiff could follow up at this indigent clinic but needed immediate attention for then current hypertensive crisis (Tr. 865).

### Psychological Treatment Records

On July 31, 2008, the plaintiff sought treatment from Dr. Eduardo Cifuentes, a psychiatrist, who noted that the plaintiff had been experiencing stress because of work and her husband's medical issues.  The stress caused irritability and mood fluctuations. Dr. Cifuentes noted that the plaintiff was compliant with medications.  Exam revealed neutral mood with full range of affect, coherent and linear thought process, and fair judgment and insight.  Dr. Cifuentes assessed the plaintiff as having bipolar affective disorder and increased her Celexa (Tr. 400).

On September 4, 2008, the plaintiff saw Dr. Cifuentes for a follow-up.  He noted that her stressors had increased with having to pay $900 child support per month and that she was more emotionally labile because of increased worry.  Diagnosis remained

unchanged from prior visit (Tr. 399).  On September 24, 2008, Dr. Cifuentes reported that the plaintiff was having a positive response to medications but continued with child support stressors (Tr. 398).

On October 22, 2008, Dr. Cifuentes noted that the plaintiff was having trouble sleeping, had been more active during the night at home, felt happy and reported that others has noticed she was excessively happy, engaged in some increased spending, and had some racing thoughts.  Dr. Cifuentes discussed symptoms of mania with the plaintiff and noted that her mood was hypermanic with full range affect and that her judgment and insight was fair (Tr. 396).

On February 11, 2009, Dr. Cifuentes saw the plaintiff for follow-up noting that she was afraid to "close her eyes," had medical issues, neck surgery scheduled, that a recent ECG indicated silent heart attack, and that she was stressed about managerial changes at work.  He noted that she was more down than up during the past month.  Exam revealed depressed mood with bright/full affect.  Dr. Cifuentes noted that the plaintiff was suffering from decreased sleep, decreased appetite, loss of energy, and racing thoughts (Tr. 396).

On March 23, 2009, Dr. Cifuentes saw the plaintiff in follow-up noting that she was terminated from her job for not showing up and was experiencing more frequent panic attacks.  Exam revealed depressed mood with restricted affect. Dr. Cifuentes noted that the plaintiff's symptoms of depression and anxiety were more prominent (Tr. 395).

On June 30, 2009, Dr. Cifuentes reported that the plaintiff was "completely withdrawn from the world" and wanted to discuss being put in a secure facility, but was having trouble leaving her home (Tr. 392).

On July 8, 2009, Dr. Cifuentes reported that the plaintiff was having problems leaving her home without panic, slept through the night only once every two to three nights, was compliant with her medications, but was more withdrawn and depressed.  Exam

revealed depressed, anxious, and aggravated mood worsened by back pain with restricted affect.  Dr. Cifuentes noted that the plaintiff continued to suffer from decreased sleep, appetite, and energy, and he observed that her gait and station were slow from the back pain.  His assessment included increased prominence of anxiety symptoms, and he increased her dose of Celexa (Tr. 391).

On September 1, 2009, Dr. Cifuentes reported that the plaintiff was hospitalized twice since last her last visit, wished to detox using methadone, and had hallucinated from taking too many BC powders.  She had stopped Celexa and Lamictal months ago and wanted to start Celexa again and inquired about doctor managing methadone (Tr. 390).  On September 16, 2009, Dr. Cifuentes reported that the plaintiff requested a letter for work purposes indicating why she was on methadone after which she called to report she was going to the hospital for detox (Tr. 388).  On September 29, 2009, he reported that the plaintiff was doing a little bit better, they discussed not refilling pain medications again, and Dr. Cifuentes's mental status exam revealed only an anxious mood (Tr. 387).  The plaintiff returned every few months for medication follow-ups, and Dr. Cifuentes assessed mild to moderate functional limitations, as signified by Global Assessment of Functioning ("GAF") scores in the 50s and 60s (Tr. 384, 385, 386, 542, 545, 548, 550, 615, 617).[4]

On October 15, 2009, Dr. Cifuentes reported that the plaintiff felt afraid all the time, had financial stressors, decreased appetite, and was losing weight.  Exam revealed anxious/afraid mood with bright and full affect. Dr. Cifuentes' assessment included bipolar

---

[4]  A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning."  *Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed., Text Revision*, p. 32 (2000).  A score between 51 and 60 denotes "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . " *Id*. at 34.  A score between 61 and 70 denotes "mild symptoms . . . or some difficulty in social, occupational, or school functioning . . .  by generally functioning pretty well." *Id*.

affective disorder ("BAD") with more prominent anxiety symptoms for which he started her on Klonopin and Trazadone and advised her to continue Lamictal (Tr. 386).

On December 2, 2009, the plaintiff was seen again by Dr. Cifuentes. He noted that she continued with increased anxiety, decreased sleep, anhedonia, decreased appetite, decreased interest level, decreased motivation, and decreased energy. He noted that her response to interventions was poor and that her BAD/anxiety was worse. Diagnoses included BAD, anxiety NOS, and opioid dependence (Tr. 385).

On December 30, 2009, Dr. Cifuentes noted that the plaintiff continued to stay in bed most of the time, had trouble sleeping, could not leave her home, and had a sick feeling in the pit of her stomach. Additionally, the doctor noted that the plaintiff's husband had just had stomach surgery for the seventh time, that she was under financial stress, and that her outlook had changed after neck surgery. Exam revealed depressed mood with restricted affect and anxiety with somatic symptoms and worrying. Dr. Cifuentes also reported that the plaintiff had decreased sleep and was tearful. His diagnoses of BAD/anxiety remained unchanged but he noted that opioid dependence was improved (Tr. 384).

On March 2, 2010, Dr. Cifuentes noted that the plaintiff was somewhat improved, was not crying as much, but continued to be afraid to leave home and did not sleep for four days two weeks prior to the visit. He reported that the plaintiff rediscovered her faith. Exam revealed anxious mood with labile and restricted affect, anxiety, and panic. Dr. Cifuentes noted that the plaintiff continued to suffer from decreased sleep, appetite, and energy and reported that Lamictal was too expensive (Tr. 541). His diagnoses remained unchanged and he gave her a trial of Lithum. On March 30, 2010, Dr. Cifuentes saw the plaintiff for a follow-up and noted that she had some improvement with the medication, was not crying as much, but had a couple of days without sleep that month. He assessed her

15

response to intervention as fair (Tr. 736).  On April 15, 2010, Dr. Cifuentes noted that the plaintiff felt better on Zoloft but that her mood was still up and down (Tr. 540).

In a letter dated April 8, 2010, Dr. Cifuentes reported that the plaintiff had been his patient since October 2005 for treatment of bipolar disorder and that her treatment has been riddled with changes in medication to address the pervasive symptoms. He also noted that the plaintiff suffered from severe anxiety and panic that markedly restricts her daily activities to the point that at times her anxiety was so high that she did not leave her home for several days. Dr. Cifuentes reported that her other symptoms included difficulty sleeping, crying spells, and low energy for which he prescribed an antidepressant and an anti-anxiety medication. Dr. Cifuentes referred to the plaintiff's physical impairments including asthma, hypertension, and chronic lower back pain noting that the interplay of the psychological concerns and physical problems had marginalized her daily functioning to the extent that she has difficulty performing some routine tasks. He assessed her prognosis as fair given her health and psychological issues and opined that for the foreseeable future the plaintiff was completely disabled from all forms of gainful employment (Tr. 528).

On May 25, 2010, Dr. Cifuentes noted that the plaintiff continued to be afraid to leave the house and requested that her Zoloft be increased (Tr. 732).

In July 2010, the plaintiff returned to the Trident emergency room several days in a row as a result of another episode of intravenous drug abuse, involving crushed OxyContin mixed with water.  The plaintiff reported she was having panic attacks when the intravenous drug effect wore off, and complained of chest pain and shortness of breath (Tr. 659-60, 683). Doctors diagnosed, among other things, "anxiety for opioid withdrawal" (Tr. 660).

During a visit with Dr. Cifuentes on August 10, 2010, the plaintiff complained of depression symptoms, wished she was dead, wanted to discuss hospitalization, was suffering from decreased sleep, and was relying on Ativan more since being home alone.

Exam revealed restricted affect, anxiety, and panic.  Dr. Cifuente's diagnosis was unchanged from prior visits (Tr. 729).

In a note on which the date is illegible, Dr. Cifuentes noted that the plaintiff requested the office contact the pharmacy regarding an early fill of Ativan.  She reported Dr. Cifuentes was aware it was an early fill since she was taking more than prescribed but vowed to take as prescribed.  The pharmacist indicated she was requesting medication two weeks early and since she had a history of early fills, she had been flagged for DHEC oversight (Tr. 728).

On October 5, 2010, the plaintiff saw Dr. Cifuentes for follow-up.  He noted her condition was unchanged and that she had three to four days without sleep, had difficulty breathing at night, wanted to go to inpatient, but had guilt about leaving things unfinished at home.  Dr. Cifuentes noted that the plaintiff's response to intervention remained poor and that her mood symptoms, anxiety, and opioid dependence were more prominent (Tr. 725).

### *Administrative Hearing Testimony*

At the September 16, 2011, hearing, the plaintiff testified that her physical impairments included uncontrolled blood pressure, which hurt her vision, and caused headaches and shortness of breath (Tr. 18-20); lung problems causing shortness of breath (Tr. 20); kidney stones (Tr. 18-19); a hole in her heart causing chest pain (Tr. 18-19); hepatitis C (Tr. 18-19); and chronic indigestion, requiring Pepto-Bismol (Tr. 25).  She said that 80 percent of the time "there is something" hurting, for which she generally takes over-the-counter pain medication (Tr.  21, 25). The plaintiff further testified that she had depression, obsessive compulsive disorder ("OCD"), and panic attacks (Tr. 21-22, 26, 30). She acknowledged an addiction to narcotic pain medication, but said it was no longer a problem (Tr. 31).

In terms of daily activities, the plaintiff stated she separates and folds laundry, drives to the pharmacy and corner store, washes dishes, watches television, reads books about crime, and sometimes reads entertainment magazines and goes to see movies (Tr. 27-28).  She added that she was no longer as social as she had been (Tr. 29).

## ANALYSIS

The plaintiff alleges disability commencing April 20, 2009, at which time she was 44 years old.  She was 47 years old on the date of the ALJ's decision.  She has a high school education and past relevant work experience as an administrative assistant, sales associate, and bookkeeper. The ALJ determined that the plaintiff has the residual functional capacity ("RFC") to perform a reduced range of sedentary work with other limitations as set forth above.  The vocational expert identified the jobs of surveillance system monitor, weight inspector, and type copier as representative occupations that a hypothetical individual of the plaintiff's age, education, work experience, and RFC could perform.  The plaintiff argues the ALJ erred by: (1)  failing to identify and rate all of her severe impairments and conducting a fragmentized analysis of her multiple severe impairments; (2)  improperly rejecting the opinion of her treating psychiatrist; and  (3)  failing to carry the Commissioner's burden at step five of the sequential evaluation process.

### *Severe Impairments*

At step two of the sequential evaluation, the ALJ found that the plaintiff has the following severe impairments: back disorder, COPD, obstructive sleep apnea, hypertension, bipolar disorder, and anxiety (Tr. 49).  The ALJ noted that the plaintiff had at various times been diagnosed with chest pain, abdominal pain, and hepatitis C, and also had a history of intravenous drug abuse (Tr. 49). However, he further noted that: radiographs of the plaintiff's chest and abdomen were unremarkable (Tr. 49-50; *see* Tr. 292, 296, 786); there was no evidence of hepatitis C symptoms (Tr. 50); and, following her drug rehabilitation in July 2009, Dr. Cifuentes generally found her opioid dependence stable

(Tr. 50; *see* Tr. 384, 386, 387, 540). The ALJ concluded these were nonsevere impairments for step two purposes (Tr. 50).

The plaintiff argues that "the ALJ failed to properly identify [her] insomnia, advanced cortical atrophy, neck mass status post surgical removal with subsequent respiratory failure, cardiomegaly, elbow fracture, possible ovarian carcinoma, pleurisy, and/or granulomatous lung disease.  The decision provides no rationale for not identifying these impairments at step two" (pl. brief 12-13).

As argued by the Commissioner, the record shows that these alleged impairments did not significantly limit the plaintiff's ability to do basic work for 12 continuous months, or, alternatively, that the ALJ did account for the impairments.  Specifically, the plaintiff's benign neck mass was removed in March 2009, prior to the alleged onset date, and the ventilator complication resulted only in an extra day or two in the hospital (Tr. 624-29, 631-33).  Radiographs and diagnostic testing revealed cardiomegaly, but nothing showed resulting functional limitations (*e.g.*, Tr. 297-98, 781, 862).  The plaintiff's elbow fracture apparently resolved without complications (Tr. 322-31).  While an abdominal CT scan in April 2010 revealed a large cystic mass that was worrisome for ovarian carcinoma, the undersigned has found no further mention of this issue in the record (Tr. 603-604), and the plaintiff has cited none.  Furthermore, the ALJ accounted for the plaintiff's insomnia, pleurisy, and granulomatous lung disease by finding obstructive sleep apnea and COPD severe at step two and discussing the related evidence in his RFC analysis (Tr. 49, 53, 55).  Based upon the foregoing, this allegation of error is without merit.

Furthermore, if an ALJ commits error at step two, it is rendered harmless so long as the ALJ properly concludes that the claimant cannot be denied benefits at step two, but rather continues to the next step of the sequential evaluation process. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that any error at step two of the sequential evaluation process becomes harmless if the ALJ "reached the proper conclusion

that [the claimant] could not be denied benefits at step two and proceeded to the next step of the evaluation sequence"). Here, the ALJ found the plaintiff had several severe impairments and proceeded to the next step of the sequential evaluation process. Accordingly, any allegation of error in this regard is harmless.

**Step Three**

The plaintiff next argues that, at step three of the sequential evaluation process, the ALJ "conducted only a fragmentized analysis of those impairments that he did find to be severe" (pl. brief 13-14). *See* 20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3) ("If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing."). When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)). The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. §§ 404.1523, 416.923.

Here, the ALJ discussed the plaintiff's various impairments together at step three and explained why they did not meet any listings. The ALJ specifically considered Listings 1.04, 3.02, 3.03, 3.10, 4.02, 12.04, and 12.06 (Tr. 50-51). He also expressly noted that he considered the plaintiff's impairments, both severe and nonsevere, in combination

20

(Tr. 50-51), noting that the medical evidence indicated the plaintiff was able to ambulate and perform fine and gross manipulations and there was no evidence to suggest that she was unable to perform all of the mental activities generally required by competitive, remunerative, unskilled work (Tr. 51). The ALJ also considered the combined effect of the plaintiff's impairments in the RFC assessment (Tr. 52-56). The ALJ reduced the exertional level and postural movements to account for the plaintiff's back disorder, obstructive sleep apnea, and hypertension. In consideration of her COPD, she was restricted from concentrated exposure to respiratory irritants. The ALJ also limited the plaintiff to simple, routine, repetitive tasks requiring no more than occasional contact with co-workers and no contact with the general public in deference to her bipolar disorder (Tr. 56). Based upon the foregoing, the undersigned finds no error in this regard.

Moreover, as argued by the Commissioner, even if the ALJ did err, the plaintiff has failed to show resulting harm. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). The plaintiff argues that her combination of mental and physical impairments met or equaled a listing; however, she does not identify which listing nor does she explain how her impairments combined to meet each requirement of this hypothetical listing (pl. brief 14). Accordingly, the plaintiff has not shown that further evaluation by the ALJ would have resulted in his finding that her combination of impairments meets any listing as she must for remand.

### Treating Physician

The plaintiff next argues that the ALJ improperly rejected the opinion of Dr. Cifuentes, her treating psychiatrist (pl. brief 14-16). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and

21

the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927].  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

In a letter dated April 8, 2010, Dr. Cifuentes reported that the plaintiff had been his patient since October 2005 for treatment of bipolar disorder and that her treatment has been riddled with changes in medication to address the pervasive symptoms.  He also

noted that the plaintiff suffered from severe anxiety and panic that markedly restricts her daily activities to the point that at times her anxiety was so high that she did not leave her home for several days.  Dr. Cifuentes reported that her other symptoms included difficulty sleeping, crying spells, and low energy for which he prescribed an antidepressant and an anti-anxiety medication.   Dr. Cifuentes referred to the plaintiff's physical impairments including asthma, hypertension, and chronic lower back pain noting that the interplay of the psychological concerns and physical problems had marginalized her daily functioning to the extent that she has difficulty performing some routine tasks.  He assessed her prognosis as fair given her health and psychological issues and opined that for the foreseeable future the plaintiff was completely disabled from all forms of gainful employment (Tr. 528).

        The ALJ gave the opinion little weight, noting that it was "not supported by the objective medical evidence and progress notes show improvement" (Tr. 56).  Mental status examinations were generally within normal limits, typically showing only some anxiety (Tr. 56; *see* Tr. 540, 542, 543).  Further, Dr. Cifuentes assigned GAF scores indicating only moderate or mild functional limitations (Tr. 56; *see* Tr. 542, 545, 548, 550).  In addition, the ALJ accorded great weight to the State agency medical consultants' mental assessments (doc. 56).  Drs. Clausen and Brown drew conclusions inconsistent with Dr. Cifuentes' (Tr. 528, 562-78, 829-45).  They found that the plaintiff was only moderately limited, as opposed to entirely disabled (Tr. 576-77, 829-30). Like the ALJ, they noted that Dr. Cifuentes' treatment notes did not show disabling limitations and concluded the plaintiff could do a limited range of work (Tr. 576-77, 829-30).  Based upon the foregoing, the undersigned finds that the ALJ's evaluation of Dr. Cifuentes' opinion was without error and based upon substantial evidence.

        The plaintiff briefly argues that the ALJ should have assigned greater weight to the opinions and evaluations of Drs. Duc and Spandorfer (pl. brief 16).  In an April 2010 letter, Dr. Duc discussed the radiographs and his clinical exam results (Tr. 649, 815).  As

23

the ALJ noted, Dr. Duc concluded that his treatment had successfully reduced the plaintiff's pain (Tr. 54; *see* Tr. 649, 815). Moreover, the ALJ noted that no medical records show musculoskeletal abnormalities after April 2010 (Tr. 54; *see* Tr. 773, 795, 796, 814). As for Dr. Spandorfer, the ALJ correctly noted that his evaluations consistently found only moderate airflow limitation while medicated (Tr. 55; *see* Tr. 405, 409, 413, 417, 421, 555). As both Drs. Duc and Spandorfer found moderate limitations that are consistent with the ALJ's findings and assessed RFC, this allegation of error is without merit.

### Step Five

Lastly, the plaintiff argues that the ALJ erred at step five of the sequential evaluation process by failing to identify and resolve an apparent inconsistency between the vocational expert's testimony and the *Dictionary of Occupational Titles* (*"DOT"*). At step five, the ALJ asked the vocational expert what jobs someone with the plaintiff's RFC could perform (Tr. 33-35). The vocational expert responded with three: surveillance system monitor, weight inspector, and type copier (Tr. 34). Each job had a "specific vocational preparation" ("SVP") of 2, indicating that each job required only something beyond a short demonstration, but less than 1 month, to learn (Tr. 3). The ALJ told the vocational expert to advise him if he gave an opinion that conflicted with the *DOT* and to also give the basis of his opinion. The vocational expert responded that he would; no conflict was identified (Tr. 33).

Social Security Ruling ("SSR") 00-4p provides in pertinent part:

When a [vocational expert ("VE")] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:

Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and

24

> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled.  The adjudicator will explain in the determination or decision how he or she resolved the conflict.  The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *4.

The ALJ limited the plaintiff to simple, routine, repetitive tasks (Tr. 33, 52-56).  The plaintiff argues that the jobs identified by the vocational expert require a mental RFC greater than that to which the ALJ limited her (pl. brief 16-19).  Specifically, the surveillance system monitor and weight inspector jobs require a General Educational Development[5] ("GED") reasoning level of three and a language level of three.  The type copier job requires a reasoning level of two and a language level of two.

The Commissioner argues the ALJ properly relied on the vocational expert's testimony because " 'GED does not describe specific mental or skill requirements of a

---

[5][GED] embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." U.S. Dept. of Labor, DOT, App. C § III, 1991 WL 688702 (Fourth Ed. Rev.1991).  Reasoning level two requires the worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and][d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* Reasoning level three requires the worker to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and][d]eal with problems involving several concrete variables in or from standardized situations." *Id.* Language level two requires the worker to have a "[p]assive vocabulary of 5,000-6,000 words; [r]ead at rate of 190-215 words per minute; [r]ead adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation; [r]ead instructions for assembling model cars and airplanes; [w]rite compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs; [s]peak clearly and distinctly with appropriate pauses and emphasis,  correct punctuation, variations in word order, using present, perfect, and future tenses."   *Id.* Language level three requires a worker to be able to "[r]ead a variety of novels, magazines, atlases, and encyclopedias; [r]ead safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work; [w]rite reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech; [s]peak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice." *Id.*

25

particular job, but rather describes the general educational background that makes an individual suitable for the job . . .' " (def. brief 14 (quoting *Anderson v. Colvin,* 514 Fed. App'x 756, 763-64 (10th Cir. 2013)).  The Commissioner further cites case law finding that a reasoning level of two or three is consistent with an RFC limited to simple, routine, and repetitive tasks (def. brief 14 (citing *Mason v. Astrue*, No. JKS-10-2157, 2013 WL 990399, at *4 (D. Md. March 12, 2013); *Burnette v. Astrue*, No. 2:08-cv-009-FL, 2009 WL 863372, at *5 (E.D.N.C. March 24, 2009); *Charles v. Astrue*, No. 07-1172, 2008 WL 4003651, at *4 (W.D. La. Aug. 7, 2008)).  Finally, the Commissioner argues that even if there were potential errors with the surveillance monitor and weight inspector positions, which require level three reasoning and language levels, the ALJ could still rely on the type copier position, with level two reasoning and language levels, to establish that the requisite number of positions exist in the region that the plaintiff could perform (def. brief 14-15).

While the Fourth Circuit has not specifically addressed the correlation between the DOT reasoning levels and an RFC limiting a claimant to simple, routine, repetitive work, "[t]he circuit courts that have addressed the issue have split as have many district courts – including district courts in the Fourth Circuit." *Weaver v. Colvin*, No. 1:10cv582, 2013 WL 3989561, at *11 & n.13, 14 (collecting cases).  In *Weaver*, the court was "persuaded by the reasoning underlying those cases holding that there is an apparent conflict between jobs requiring a reasoning level of three and a claimant's limitation to simple, routine, repetitive jobs." *Id.* at *12 (noting that the ALJ did not address the apparent conflict in the decision).  In this district, the court has repeatedly found that a limitation to simple or routine tasks conflicts with jobs requiring a GED reasoning level of two or three and that such a conflict must be addressed and resolved by the ALJ. *See Graham-Willis v. Colvin*, C.A. No. 1:12-cv-2489-JMC, 2013 WL 6840465, at *6-7 (D.S.C. Dec. 27, 2013); *Massey v. Colvin*, C.A. No. 3:12-3483-TMC, 2013 WL 6780575, at *8-9 (D.S.C. Dec. 19, 2013);  *Phillips v. Astrue*, C.A. No. 3:11–1085–MBS, 2013 WL 353604, at *2 (D.S.C. Jan.

29, 2013).  The undersigned has previously recommended that cases be remanded to resolve the apparent conflict in such situations.  *See Martin v. Astrue*, C.A. No. 6:11-1572-TMC-KFM, 2012 WL 4479280 (D.S.C. July 27, 2012), *R&R adopted by* 2012 WL 4482943 (D.S.C. Sept. 27, 2012); *Reid v. Astrue*, C.A. No. 6:10-2118-MBS-KFM, 2012 WL 667164 (D.S.C. Feb. 8, 2012), *R&R adopted by* 2012 WL 663482 (D.S.C. Feb. 29, 2012).

Here, there is an apparent conflict between what the plaintiff is capable of performing and what the identified jobs require.  As the ALJ never discussed with the vocational expert whether the plaintiff's inability to perform more than simple, routine, repetitive tasks was compatible with the cited positions, it would be speculation for the court to assume the vocational expert realized the conflict and necessarily considered it.  Accordingly, upon remand, the ALJ should be instructed to obtain vocational expert testimony as to any conflict between the reasoning and language levels for the jobs identified by the vocational expert and the limitations imposed by the ALJ.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 7, 2014
Greenville, South Carolina

27